KYLE W. SCHUMACHER (BAR #121887)
kyle@schumacherlane.com
**SCHUMACHER LANE PLLC**
P.O. Box 558
Spring Branch, TX 78070
503-482-8137 ph
210-783-1383 fax
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| Winston L. Young, Jr.,<br>　　　　　Plaintiff,<br><br>　　v.<br><br>Goldman Sachs Bank USA,<br>　　　　　Defendant. | CASE NO. 3:25-cv-1531<br><br><br>**PLAINTIFF'S COMPLAINT FOR DAMAGES:**<br><br>　1.　Violation of Fair Credit Reporting Act |

COMES NOW Plaintiff **WINSTON L. YOUNG, JR.,** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

**INTRODUCTION**

1.　This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendant in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2.　Defendant Goldman Sachs Bank USA ("Goldman Sachs") is not reporting Plaintiff's account accurately as discharged in bankruptcy.

3.　The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4.　A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's

creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

5. The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

6. In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

7. Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

8. Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

9. This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

10. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

11. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

12. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

13. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), the named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

14. Plaintiff alleges that the Goldman Sachs account was included in his Chapter 7 bankruptcy filing in that the debt was incurred pre-petition and was subsequently discharged.

15. Despite the fact the Goldman Sachs account was discharged, the account is reporting on Plaintiff's Equifax credit report as open, with a past due payment status, past due

amount, a balance, and a scheduled payment amount; all of which are patently incorrect and misleading.

16.    Despite the fact the Goldman Sachs account was discharged, the account is reporting on Plaintiff's TransUnion credit report as with a past due payment status, past due amount, and a balance; all of which are patently incorrect and misleading.

17.    Plaintiff alleges that it is patently incorrect and misleading for a debt which was discharged in bankruptcy to report as a past due account, with a past due amount, a balance, or a scheduled payment amount.

18.    Plaintiff alleges that Defendant is familiar with FCRA requirements and subscribes thereto.

19.    Plaintiff alleges that Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

20.    Plaintiff alleges that all of the Defendant's actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair his Credit Score.

21.    In the alternative, Plaintiff alleges that the Defendant's actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

22.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    FICO, Inc.**

23.    FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

24.    The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions. [1]

25.    A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

26.    Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

27.    Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

28.    There are twenty-eight (28) FICO Scores that are commonly used by lenders.

29.    A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

30.    The three largest CRAs are Experian Information Solutions, Inc.; Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

31.    FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

32.    There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

33.    Each of the five (5) factors is weighted differently by FICO.

34.    In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

35.    Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy,

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See https://www.myfico.com* (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

36.     In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

37.     Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

38.     FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

39.     A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions." *See id*.

40.     Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score."

**B.     e-OSCAR**

41.     e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

42.   When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

43.   The ACDV contains codes next to certain data fields associated with a credit file.

44.   When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

45.   When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

46.   For clarification, an AUD or other regular transmission is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**C.   Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

47.   When a consumer files bankruptcy, certain credit reporting industry standards exist.

48.   Certain data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

49.   The Consumer Information Indicator ("CII") is a critical field that indicates a special condition that applies to a specific consumer.

50.   It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

51.   The CII Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

52.   The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

53.   The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

54.   Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

55. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

56. The FCRA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

57. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

58. The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

59. Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**D.    Plaintiff's Debt was Discharged Pursuant to his Bankruptcy**

60. Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on July 10, 2024, in order to repair his creditworthiness and Credit Score.

61. Plaintiff's bankruptcy was discharged on October 21, 2024.

62. Goldman Sachs was listed in Plaintiff's bankruptcy schedules and received electronic notice of the bankruptcy filing and discharge order.

63. All debts, including the Goldman Sachs debt, were discharged on October 21, 2024.

64. Goldman Sachs had actual knowledge the debt was discharged.

**E.    Plaintiff's Credit Reports Contain Inaccurate and Adverse Tradelines, which Plaintiff Disputed to no Avail**

65. On November 18, 2024, Plaintiff ordered an Equifax credit report and a TransUnion credit report to ensure proper reporting by Plaintiff's creditors (the "November 18 Credit Reports").

66. Plaintiff noticed adverse tradelines in his November 18 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with the FCRA standards.

67. Plaintiff then disputed the inaccurate tradeline regarding the Goldman Sachs account via certified mail to Equifax on or about December 20, 2024 (the "First Equifax Dispute Letter").

68.     Plaintiff again disputed the inaccurate tradeline regarding the Goldman Sachs account via certified mail to Equifax on or about March 18, 2025 (the "Second Equifax Dispute Letter").

69.     The First Equifax Dispute Letter and Second Equifax Dispute Letter will collectively be referred to herein as the "Equifax Dispute Letters."

70.     Plaintiff's Equifax Dispute Letters specifically put Goldman Sachs on notice that Plaintiff filed a Chapter 7 bankruptcy, received a discharge, and his account should be updated.

71.     Plaintiff also disputed the inaccurate tradeline regarding the Goldman Sachs account via certified mail to TransUnion on or about December 20, 2024 (the "First TransUnion Dispute Letter").

72.     Plaintiff again disputed the inaccurate tradeline regarding the Goldman Sachs account via certified mail to TransUnion on or about October 24, 2024 (the "Second TransUnion Dispute Letter"), January 2, 2025 (the "Third TransUnion Dispute Letter"), and May 7, 2025 (the "Fourth TransUnion Dispute Letter").

73.     The First TransUnion Dispute Letter, Second TransUnion Dispute Letter, Third TransUnion Dispute Letter, and Fourth TransUnion Dispute Letter will collectively be referred to herein as the "TransUnion Dispute Letters."

74.     Plaintiff's TransUnion Dispute Letters specifically put Goldman Sachs on notice that Plaintiff filed a Chapter 7 bankruptcy, received a discharge, and his account should be updated.

75.     The Equifax Dispute Letters and TransUnion Dispute Letters will collectively be referred to herein as the "Dispute Letters."

76.     Plaintiff's Dispute Letters also detailed what was perceived to be problematic about the account, addressing the Goldman Sachs tradelines specifically.

77.     Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the account as required by the FCRA.

78.     Plaintiff is informed and believes that Equifax received Plaintiff's Equifax Dispute Letters and, in response, sent notice of the disputes to Goldman Sachs, as the data furnisher, via an ACDV through e-OSCAR.

79.     Plaintiff is informed and believes that TransUnion received Plaintiff's TransUnion Dispute Letters and, in response, sent notice of the disputes to Goldman Sachs, as the data furnisher, via an ACDV through e-OSCAR.

80.    Plaintiff ordered another Equifax credit report and TransUnion credit report to determine if his account was updated.

### a.    Inaccuracy – Goldman Sachs

81.    Despite actual knowledge, Goldman Sachs continued to report Plaintiff's account, ending in 6290, to Equifax as open with a payment status of "NOT_MORE_THAN_TWO_PAYMENTS_PAST_DUE", a past due amount of "$243", a balance of "$8,330", a scheduled payment amount of "$7,586", and without notation of the bankruptcy discharge. This tradeline is patently inaccurate as the account was discharged in bankruptcy in October 2024.

82.    Despite actual knowledge, Goldman Sachs continued to report Plaintiff's account, ending in 6290, to TransUnion with a payment status of ">Account 30 Days Past Due Date<", a past due amount of ">$243<", a balance of "$8,330", and without notation of the bankruptcy discharge. This tradeline is patently inaccurate as the account was discharged in bankruptcy in October 2024.

83.    Plaintiff alleges that Goldman Sachs did not investigate whether Plaintiff filed for bankruptcy.

84.    Goldman Sachs did not update the tradelines to reflect that Plaintiff obtained a discharge in bankruptcy.

85.    Equifax provided notice to Goldman Sachs that Plaintiff was disputing the inaccurate and misleading information; however, Goldman Sachs failed to conduct a reasonable investigation of the information as required by the FCRA.

86.    TransUnion provided notice to Goldman Sachs that Plaintiff was disputing the inaccurate and misleading information; however, Goldman Sachs failed to conduct a reasonable investigation of the information as required by the FCRA.

87.    Based upon the notice received during the bankruptcy, as well as Plaintiff's repeated disputes, Goldman Sachs should have known that Plaintiff received a discharged in his bankruptcy proceedings.

88.    The most basic investigation would include a simple review of its reporting in light of the fact that Plaintiff filed a Chapter 7 bankruptcy and received a discharge in order to determine if the reporting complies with the maximum possible accuracy and completeness standard of the FCRA.

89.    Plaintiff alleges that Goldman Sachs did not review if their reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or publicly available records concerning Plaintiff's bankruptcy status.

90.    If Goldman Sachs reviewed such standards, it would have seen that their reporting was not in compliance and was therefore patently inaccurate or incomplete.

91.    Goldman Sachs should have updated the tradeline to CII Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy and removed the past due payment status, past due amount, balance, and scheduled payment amount.

92.    By continuing to report Plaintiff's account as described herein above, it incorrectly appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy, which is inaccurate.

93.    As Plaintiff received his discharge the reporting on the account is misleading.

94.    The reporting is misleading as the past due amount, balance, scheduled payment amount, and lack of any bankruptcy notations further makes the account appear as if it is outstanding and collectible as opposed to discharged.

95.    As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect reporting by Goldman Sachs on the account is lowering Plaintiff's Credit Score, which adversely affects Plaintiff's ability to obtain credit.

96.    The incorrect payment status, past due amount, balance, and scheduled payment amount, reported by Goldman Sachs is lowering Plaintiff's Credit Score, which adversely affects Plaintiff's ability to obtain credit.

97.    The lack of investigation and reporting of inaccurate and incomplete information by Goldman Sachs is unreasonable.

**F.    Damages**

98.    Plaintiff pulled the credit reports at issue at a cost for access to the reports, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

99.    As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting

in doubt as to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

100. Plaintiff has been denied credit and is unable to rebuild his credit based on the inaccurate reporting by Goldman Sachs. Further, Plaintiff's diminished creditworthiness, resulting from Goldman Sachs's inaccurate reporting, has caused him to abandon his intentions to apply for certain credit.

101. Goldman Sachs's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

**FIRST CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))**

**(Against Defendant)**

102. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

A.    **Goldman Sachs Failed to Reinvestigate Following Plaintiff's Disputes**

103. Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

104. After receiving notice of the bankruptcy discharge, Goldman Sachs continued to report the account as a past due account, with an outstanding balance, past due amount, scheduled payment amount, and without notation of the discharge to Equifax.

105. After receiving notice of the bankruptcy discharge, Goldman Sachs continued to report the account as a past due account, with an outstanding balance, past due amount, and without notation of the discharge to TransUnion.

106. After receiving notice of Plaintiff's various disputes from Equifax, Goldman Sachs did not correct the inaccurate information, but instead verified and re-reported inaccurately via ACDV to Equifax.

107. After receiving notice of Plaintiff's various disputes from TransUnion, Goldman Sachs did not correct the inaccurate information, but instead verified and re-reported inaccurately via ACDV to TransUnion.

108.    Goldman Sachs has continued to report the account incorrectly. It has done so despite at least six (6) disputes from Plaintiff.

109.    Goldman Sachs was required to conduct a reasonable investigation in response to each dispute it received.

110.    Goldman Sachs violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

111.    Each failure to conduct a reasonable investigation is a separate violation of the FCRA.

112.    Equifax provided notice to Goldman Sachs that Plaintiff was disputing the inaccurate and misleading information; however, Goldman Sachs either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

113.    TransUnion provided notice to Goldman Sachs that Plaintiff was disputing the inaccurate and misleading information; however, Goldman Sachs either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

114.    Based on notices received from the bankruptcy court as well as Plaintiff's various disputes regarding his bankruptcy discharge, Goldman Sachs should have known the debt was discharged in bankruptcy and ceased its inaccurate reporting.

115.    Reporting a discharged debt as a past due account, with an outstanding balance, past due amount, or scheduled monthly payment is patently incorrect.

116.    In addition, this inaccurate reporting also adversely affects credit decisions. This inaccurately reported account is being considered when calculating Plaintiff's Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported credit score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Goldman Sachs's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and his ability to rebuild his Credit Score and obtain new credit.

117.    In the alternative, even if a credit reviewer did look at the tradeline, it would be misled as Goldman Sachs's reporting makes the account appear to be currently outstanding, past due, and not discharged.

118.    Goldman Sachs's reporting is patently incorrect and misleading.

119. As a result of Goldman Sachs's violations of 15 U.S.C. § 1681s-2(b), Plaintiff has suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

**B.     Willful Violations**

120. Plaintiff alleges that Goldman Sachs has reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

121. Plaintiff further alleges that Goldman Sachs has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, has developed reckless policies and procedures.

122. Plaintiff alleges that rather than train its employees on accurate credit reporting, FCRA requirements, and industry standards, Goldman Sachs's employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

123. Regulation V imposes on furnishers, in part, a requirement that reporting be accurate. Accuracy's definition includes correctly reflecting the account's terms and liability and reflecting the consumer's performance on the account. The reporting in this case is clearly not accurate.

124. "A willful [FCRA] violation is one committed with actual knowledge or recklessness." *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1197 (7th Cir. 2021). A violation is reckless if there is "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco Ins. Co. of Am. V. Burr*, 551 U.S. 47, 68 (2007).

125. Considering Goldman Sachs had, or should have had, actual knowledge the account was discharged in bankruptcy, its reporting of the account as currently past due account, with an outstanding balance, past due amount, and scheduled payment, rather than a CII of "E" can only be considered willful under the relevant case law and regulations.

126. Given the fact Goldman Sachs was directly noticed the debt was discharged in bankruptcy, its patently incorrect and misleading reporting was committed with actual knowledge and recklessness.

127.    Further, given this knowledge, Goldman Sachs knew that its reporting, as described herein, ran an unjustifiably high risk of harm which was known and obvious.

128.    Therefore, Goldman Sachs's actions were willful violations of the FCRA, which entitles Plaintiff to recover under 15 U.S.C. § 1681n.

129.    In the alternative, Goldman Sachs was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

## PRAYER FOR RELIEF

130.    WHEREFORE, Plaintiff prays for judgment as follows:

a. For preliminary and permanent injunctive relief to stop Defendant from engaging in the conduct described above;

b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

d. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

e. For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

f. For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

## DEMAND FOR JURY TRIAL

131.    Plaintiff hereby demands trial of this matter by jury.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: August 28, 2025

*/s/ Kyle W. Schumacher*
Kyle W. Schumacher
Attorneys for Plaintiff